UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CONTINENTAL INSURANCE COMPANY | CIVIL ACTION |
| VERSUS | NO: 18-2810 |
| BOLLINGER QUICK REPAIR, LLC, BOLLINGER AMELIA REPAIR, LLC, ROLLS-ROYCE NORTH AMERICA, INC. AND ROLLS-ROYCE ENERGY SYSTEMS, INC. | SECTION: "J"(5) |

## ORDER & REASONS

Before the Court are a *Motion for Partial Summary Judgment* **(Rec. Doc. 79)** filed by Defendants, Rolls-Royce Marine North America, Inc., Bollinger Amelia Repair, LLC, and Bollinger Quick Repair, LLC; an opposition filed thereto by Plaintiff, Continental Insurance Company (Rec. Doc. 80); a reply by Defendants (Rec. Doc. 87); and a sur-reply by Plaintiff (Rec. Doc. 94). Having considered the motion and legal memoranda, the record, and the applicable law, the Court finds that the motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

In December 2015, the M/V OCEAN PIONEER, which was owned and operated by Hydra Offshore Construction, Inc. ("Hydra") and insured by Plaintiff Continental Insurance Company ("CNA"), was docked at the Gulf Copper shipyard in Port Arthur, Texas when a loose mooring line that was adrift in the harbor became tangled in and fouled the OCEAN PIONEER's port and starboard propellers. Divers

1

removed the line and found no underwater damage to the vessel. The vessel then performed two jobs offshore without any problems. In February 2016, the vessel sailed to Defendant Bollinger's yard for drydocking and for inspection by the United States Coast Guard. During the inspection, the Coast Guard observed an oil sheen and required repairs before it would issue a new Certificate of Inspection.

Consequently, Hydra entered into an oral contract with Bollinger to repair the oil leak and refurbish and rebuild components of the OCEAN PIONEER's controllable pitch propeller systems ("CPPS"). Bollinger subcontracted with Defendant Rolls-Royce, who designed and manufactured the vessel's CPPS, to perform some of the repair work. In March 2016, Bollinger and Rolls-Royce began the repair work, which concluded in December 2016. The vessel then departed Bollinger's shipyard for Port Arthur for testing of the vessel's CPPS and dynamic positioning system. While in transit, the CPPS allegedly began "hunting" due to hydraulic pressure fluctuations in the port side CPPS, which caused the port propeller blades to oscillate and fail to settle on the order of pitch. Plaintiff alleges that the vessel did not experience hunting issues prior to the repair work done by Bollinger and Rolls-Royce; however, Defendants argue that the CPPS was hunting before their attempted repairs.

On March 10, 2017, Hydra put Bollinger on notice of its intent to pursue a claim for damage and continuing issues related to the OCEAN PIONEER's CPPS. On April 12, 2017, Hydra placed CNA on notice that it was abandoning the OCEAN PIONEER and tendering the vessel to it as a constructive total loss. On May 25, 2017,

the parties commenced a joint teardown and inspection of the CPPS, which was attended by surveyors for all parties.

On March 16, 2018, CNA filed the instant lawsuit to recover the amounts that it was obligated to pay its insured, Hydra, for the damage to the OCEAN PIONEER caused by Bollinger's and Rolls-Royce's alleged failure to properly repair the vessel. Specifically, CNA asserted claims for negligence and breach of workmanlike performance. After asserting general denials and affirmative defenses, Defendants filed the instant motion for partial summary judgment. (Rec. Doc. 79). In this motion, Defendants seek to limit Plaintiff's recovery to the original repair costs paid to Bollinger as a matter of law.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be

satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for trial. *See, e.g., id.* at 325; *Little*, 37 F.3d at 1075.

## **DISCUSSION**

Defendants argue that Plaintiff's recovery should be limited to the original repair costs because, under general maritime law, the proper measure of damages in a negligence action "is to place the injured person as nearly as possible in the

condition he would have occupied had the wrong not occurred." *Gaines Towing & Transp., Inc. v. Atlantic Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999) (internal citations and quotations omitted). Thus, "a defendant cannot be held liable for damages that he has not been shown to have caused, or for the cost of repairs that enhance the value of the damaged property compared with its pretort condition." *Id.* However, Plaintiff has stated claims for both negligence and breach of the warranty of workmanlike performance.

The contracts of ship repairers fall under admiralty jurisdiction, and thus, are subject to doctrines of general maritime law, such as the warranty of workmanlike performance. 1 Admiralty & Mar. Law, Thomas J. Schoenbaum, § 5:14 (6th ed.). Unless excluded by agreement, all maritime service contracts include an implied warranty of workmanlike performance. *See Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 416 (5th Cir. 1982). "The warranty of workmanlike performance binds the ship repairer to use that degree of diligence, attention, and skill which is adequate to complete the task." 1 Admiralty & Mar. Law, Thomas J. Schoenbaum, § 5:14 (6th ed.) (internal citations omitted).

Plaintiff argues that the measure of damages under the warranty of workmanlike performance and maritime negligence are different, whereas, Defendants argue that the measure of damages are the same under both theories of liability. Both parties cite *Todd Shipyards Corp. v. Turbine Services, Inc.* to support their position. 467 F. Supp. 1257 (E.D. La. 1978), aff'd in part, modified in part and rev'd in part, 674 F.2d 401 (5th Cir. 1982). However, despite Defendants' attempts to

5

cherry pick quotes from the opinion, the court in *Todd Shipyards Corp.* explicitly rejected Defendants' argument by declining to apply the tort measurement of damages and, instead, held that the party that breached the warranty of workmanlike performance was liable for all foreseeable losses caused by the breach. *Id.* at 1304-05. Accordingly, the Court finds that, if Defendants breached the warranty of workmanlike performance, then Defendants may be liable for all foreseeable losses incurred by Plaintiff as a result, including loss of use of the vessel, property damage, reasonable attorneys' fees, and litigation expenses. *See* 1 Admiralty & Mar. Law, Thomas J. Schoenbaum, § 5:15 (6th ed.); *Todd Shipyards Corp.*, 674 F.2d at 412, 415.

Defendants also argue that they are entitled to summary judgment because there is no evidence that Defendants caused additional damage to the OCEAN PIONEER; therefore, Plaintiff's damages should be limited to the amount paid for the allegedly substandard repairs. Plaintiff's marine surveyor, Ian Kerr, issued a report explaining the extent of damage to the CPPS as follows:

> 1. Port CPP – 1 x leaking blade (palm) seal.
> 2. Starboard CPP – 2 x leaking blade palm seal.
> 3. Starboard stern tube seal leak.
> 4. Port CPP 1 x broken 'O' ring (palm seal).
> 5. Port CPP 3 x wrong size 'O' ring in blade seal ring (outer seal).
> 6. Starboard CPP 3 x wrong size 'O' ring in blade seal ring (outer seal).
> 7. Port and starboard stern tube seal adaptor rings were found not to EOM construction creating a stepped joint which was source of starboard stern tube seal leak.
> 8. Port and starboard blade seal rings (6) found not to be to OEM dimensions creating excess clearance between ring and hub and wrong construction on palm side seal.
> 9. Port and starboard CPP wrong size 'O' rings on all blade bolts.
> 10. Port and starboard CPP double 'O' rings on all blade bolts.

11. Port and starboard CPP found 0.010" shim installed under blade palm connection.
12. Port aft stern tube bearing mount protruding beyond face of stern tube flange.
13. Port and starboard OD box bearing block assemblies found installed incorrectly with excess clearance on one side of fork.
14. Port OD box carrier key (pin) found with edges and surfaces abraded with what looks like grinding disc marks.
15. Port oil supply pipe union thread to CPP hub found damaged and sealed with PTFE tape.
16. Starboard oil supply pipe similar though not as severe damage noted.
17. Port and starboard CPP oil supply valve pins found scored on lands.
18. Port crosshead threads found damaged due to non OEM style locking arrangement used.
19. Port and starboard crosshead LP oil seals found displaced when removing crosshead. Port seal found completely out, starboard seal found "bound up" in hole. Peened edges unable to retain seals into their respective locations.
20. Port stern tube, found piece of duct tape in stern tube LO system.
21. Hammer marks on joining faces of shaft coupling.
22. Port and starboard tails shaft keyways found with mechanical damage due impacts.
23. Port and starboard tail shaft journals found with radial scratches due to particulates in lubrication oil.
24. Starboard tail shaft in aft seal area found with numerous impact dents.
25. Port and starboard blade bolts found without nylock inserts.
26. Port and starboard hubs at repaired areas (lock screws) observed dissimilar materials and poorly bonded weld material.
27. Port and starboard hubs at repaired areas (lock screws) observed machined thread form different from original thread form.
28. Port and starboard hubs at repaired areas (lock screws) observed 'O' ring lands have several pits on the sealing surface where leaks may occur.[1]

In support of their argument, Defendants cite to the deposition testimony of Mr. Kerr wherein he stated that he was of the opinion that Defendants "just" did substandard repairs. (Rec. Doc. 79-7, at p. 18). In opposition, Plaintiff cites to Mr.

---

[1] (Rec. Doc. 80-17, at pp. 3-4).

Kerr's interim report, in which he stated that he was of the opinion that the additional damage to the CPPS could have resulted from Defendants' deficient repairs. (Rec. Doc. 80-17, at p. 4).

In addition, the parties also dispute whether the CPPS began hunting before or after Defendants' attempted repairs. Plaintiff cites to the reports of Aalmar Surveys, Inc. and Propulsion Systems, Inc., which both noted defective work on the part of Defendants. (Rec. Docs. 80-3-16). If the hunting did not begin until after Defendants' allegedly defective work, then it could be reasonable to infer that Defendants' repairs caused the hunting issue in the absence of any contradicting evidence.

Further, Plaintiff argues that Defendants negligently used worn out parts when making their repairs. Plaintiff again cites to the deposition of Mr. Kerr, wherein he testified that worn or used parts should have been replaced, renewed, and reinstalled during Defendants' repairs. (Rec. Doc. 80-18, at p. 5). However, Defendants argue (without providing a citation to supporting evidence) that it was Hydra that insisted on re-using the worn-out parts, despite their objections.

Finally, Plaintiff argues that Defendants failed to install oil filters and that metal shavings were found in the hydraulic oil and propellor hubs, which were pumped throughout the entire CPPS and resulted in additional damage. In response, Defendants argue (again without providing a citation to supporting evidence) that they had no responsibility for the oil filters and shavings because Hydra had contracted other companies for those repairs. Due to the lack of a written contract

between Hydra and Defendants, the Court cannot determine the extent of Defendants' contested responsibilities for these repairs on summary judgment.

Given the above disputed facts, it is clear to the Court that there are genuine issues of material fact regarding whether Defendants' repairs caused additional damage to the CPPS.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' *Motion for Partial Summary Judgment* **(Rec. Doc. 79)** is **DENIED**.

New Orleans, Louisiana, this 7th day of April, 2021.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE